Bobby Lee **HEARD**, Petitioner,

v.

Cecil **BOREN**, Assistant Superintendent, Cummins Unit, Arkansas Department of Correction, Respondent.

No. PB–73–C–165.

United States District Court, E. D. Arkansas, Pine Bluff Division.

Jan. 8, 1974.

Bobby Lee Heard, pro se.

Jim Guy Tucker, Atty. Gen., and Ralph C. Hamner, Jr., Deputy Atty. Gen. of Arkansas, Little Rock, Ark., for respondent.

## MEMORANDUM and ORDER

HENLEY, Chief Judge.

This suit brought under the provisions of 42 U.S.C.A., section 1983, read in connection with 28 U.S.C.A., section 1343(3), presents two questions for the immediate consideration of the Court, namely, whether the plaintiff should be permitted to proceed further in forma pauperis against Cecil Boren, who at the time of the commencement of the action was Assistant Superintendent of the Cummins Unit, Arkansas Department of Correction, and whether Dr. George W. Smiley, the prison physician, should be named as a defendant and called upon to answer or otherwise plead to the complaint, as amended.

Plaintiff would recover monetary damages from Mr. Boren and Dr. Smiley

and others on account of being confined in punitive isolation on a restricted diet from about June 28, 1973, to about August 6, 1973, following his conviction by a disciplinary panel of refusing to work in a "garden squad" in violation of Rule 8 of the Department governing the conduct and disciplining of inmates.

The record before the Court does not disclose when plaintiff was first received at the institution. His ADC number is 60321 which would indicate that he was originally received several years ago. He is a white male about 37 years of age. In 1966 he was involved in an automobile accident which resulted in serious injury to one of his hips, and it appears that he has a substantial partial and probably permanent disability of the hip which prevents him from doing heavy work or work that requires sustained walking or standing.

Prior to April 1973 petitioner was physically classified as A–2 and was assigned to work in the prison fields as a member of a hoe squad. In that month he began to have trouble with his hip and was given a temporary and apparently informal classification of P.M.D. (Permanent Medical Disability) and was not required to do any work. As the inmates put it, he was permitted to "lay in."

Subsequently he was brought to the Medical Center of the University of Arkansas at Little Rock for evaluation by orthopedic surgeons. A report dated May 3, 1973, and signed by Dr. Frank Dodson, an orthopedic resident at the Medical Center, contains the following recommendation:

"It is recommended the patient have crutches available to him for periods when his hip symptoms become very severe. He should remain non weight bearing on the right lower extremity upon aggravation of these symptoms. It is also recommended he be assigned to as light duty as is consistent with his current situation. . . ."

Upon his return to Cummins plaintiff was again permitted to "lay in" until June 27. Regardless of the fact that plaintiff had been permitted to "lay in" since April his formal medical classification had never been changed from A–2 to P.M.D. or anything else.

On June 26 Dr. Smiley, who had by that time received and studied material submitted by the Medical Center, concluded that plaintiff should be reclassified and placed in Class A–3. Generally speaking, inmates in Class A–3 are considered to be fit to work in the garden squads which entail substantially less work than do the hoe squads. There was nothing on the reclassification sheet signed by Dr. Smiley that would indicate that plaintiff was not physically able to do garden squad work.

On the morning of June 27 plaintiff's supervisor directed him to go to work in the garden squad, which plaintiff refused to do, professing that he had a classification of P.M.D. No action was taken immediately, and plaintiff remained in barracks until noon when he was again directed to go to work. He again refused, again claiming a P.M.D. classification.

At this point Mr. Boren came into the picture and ascertained that plaintiff was classified as A–3. Boren talked with Dr. Smiley, and, according to Boren, Dr. Smiley told him that there was no reason for plaintiff not to work in the garden squad. That information was communicated to plaintiff who still refused to go to work.

When plaintiff persisted in his refusal, he was conveyed to the maximum security unit, and on the following day he was charged with having violated Rule 8. The charge was heard by a disciplinary panel consisting of Major Fletcher, Lieutenant Evans, a Mr. Duke, and Lieutenant Griffin. Mr. Boren was present at the hearing, but did not sit as a member of the panel, the proceedings of which were recorded on tape.

The charge was explained in detail to plaintiff who entered a plea of not guilty. He was asked if he would like to call any witnesses, and he stated that he

had no witnesses, except perhaps the doctor in Little Rock. Asked if he would like to make a statement, plaintiff repeated his assertion that he was not able to work in the garden squad and would not do so. He also stated that he was willing to do any work that he was physically able to do. The panel found him guilty, sentenced him to indefinite confinement in isolation and to forfeiture of 365 days of good time if he had that much good time to his credit. He was advised of his right to appeal to Superintendent A. L. Lockhart, but he did not appeal.

Plaintiff was in punitive isolation from June 28 to August 6 when he was released by Mr. Boren and assigned to work in the kitchen where apparently he is still working. In the meantime, on July 27 plaintiff had been examined by Dr. Smiley, and the doctor made a notation on his records that he did not think that plaintiff should be working in the garden squad.

According to Mr. Boren, he did not learn of the notation just mentioned until August 6, and that as soon as he learned of it, he released plaintiff from punitive, apologized to him, and assigned him to kitchen work.

The original petition was presented to the Court on or about August 27, 1973. Plaintiff tendered as defendants the Arkansas State Board of Correction; Terrell Don Hutto, Arkansas Commissioner of Correction; A. L. Lockhart, Superintendent of the Cummins Unit of the Department; Jerry Campbell, Assistant Superintendent at Cummins; Cecil Boren who has been mentioned; Reggie Fletcher, who has also been mentioned as a member of the disciplinary panel that sat on plaintiff's case; and Dr. Smiley.

The Court examined the petition and on August 27 permitted it to be filed against Mr. Boren alone. The Court found that the petition stated no cause of action against the Department of

Correction or the members thereof, or against Mr. Hutto, Superintendent Lockhart, Assistant Superintendent Campbell, and Major Reggie Fletcher. The Court also concluded at the time that the complaint did not state a cause of action against Dr. Smiley.

Thereafter, a response was filed on behalf of the "State of Arkansas" and on behalf of the Arkansas Department of Correction by Mr. Ralph C. Hamner, Deputy Attorney General of the State of Arkansas, and plaintiff's pleadings were amended.

In his amended pleadings plaintiff again undertook to bring Dr. Smiley into the case and also undertook to name as defendants the members of the disciplinary panel that sat in his case.

In a Second Memorandum Opinion and Order filed on October 9, 1973, the Court declined "to permit petitioner to name as defendants the members of the disciplinary panel, at least at this time." And the Court stated that plaintiff "may or may not be entitled to proceed against Dr. Smiley."

The Court then proceeded to refer the case to Robert W. Faulkner, Esq., a United States Magistrate for the Eastern District of Arkansas, with directions to proceed to Cummins at his earliest convenience "and take sworn testimony from petitioner, Mr. Boren, and Dr. Smiley, and examine and copy the complete medical record of petitioners." It was directed that the testimony was to be reported and transcribed and the transcript submitted to the Court for its consideration. The Magistrate was also directed to ascertain whether a tape recording was made of the disciplinary proceeding involving petitioner, and, if possible, to obtain and transmit to the Court a transcript of that proceeding. And the Court indicated that after it had considered the material assembled by the Magistrate, it would give further consideration to the course that the case should take.[1]

1. In the course of the Memorandum the Court suggested that the Arkansas Attorney

General give consideration to the question of whether he and his staff are authorized and

In obedience to the direction of the Court the Magistrate went to Cummins on October 17 and conducted a hearing that was attended by Deputy Attorney General Hamner. The Magistrate took and transcribed the testimony of plaintiff and three witnesses called by him, and also heard testimony of Mr. Boren and Dr. Smiley. Additionally, the Magistrate obtained a transcript of the disciplinary proceeding which had been recorded on tape.

On November 23 the Magistrate filed the transcripts that have been mentioned, certain medical records pertaining to plaintiff, and a report, a copy of which was mailed to plaintiff and to Mr. Hamner. In his report the Magistrate summarized the testimony that he had taken and expressed the view that Mr. Boren had acted with respect to plaintiff in a legal, proper, and correct manner. No opinion was expressed with respect to the conduct of Dr. Smiley.

The Court has given careful consideration to the transcripts that have been mentioned and to the medical records, and most of the factual statements appearing in the preceding portion of this Memorandum are based on the transcripts and the records; and, as a matter of fact, it appears to the Court that the case has been developed thoroughly in the course of the Magistrate's investigation.

All of the witnesses were sworn by the Magistrate and were questioned closely by him. While plaintiff was not represented by counsel in the proceedings before the Magistrate, it is clear from his own testimony and from the questions that he put to various other witnesses that he is an intelligent and articulate individual.

▇ In determining whether and to what extent an inmate of a prison should be permitted to proceed in forma pauperis against prison personnel under 28 U.S.C.A., section 1915, the Court is required to exercise its discretion; and where, as here, the inmate seeks to hold prison personnel liable for pecuniary damages, the Court's discretion should for obvious reasons be exercised sparingly, albeit not grudgingly.

▇ With respect to parties defendant generally, the Court now adheres finally to its earlier view that the complaint as amended states no federal claim against the members of the Arkansas State Board of Correction,[2] Commissioner Hutto, Superintendent Lockhart, or the members of the plaintiff's disciplinary panel. Moreover, the Court finds that there is no substantial basis in fact for any claim against those defendants.

As far as the disciplinary panel, Mr. Lockhart, and Mr. Hutto are concerned, it should be observed that as of June 28, 1973, when the hearing was held plaintiff was formally classified as A–3, and it is evident that assignment to work in a garden squad is ordinarily appropriate for a Class A–3 inmate, and the Court knows from its long experience with Arkansas prison petitions that a great many Class A–3 inmates in fact work in the garden squads without ill effect. There was nothing before the panel to indicate that work in the garden squad was inappropriate for plaintiff as an individual. Confronted with the fact that he was classified A–3 plaintiff simply contended that he had been or should be given a P.M.D. Classification and made it clear to the panel that he was not going to work in the garden squad. He

willing to represent individual employees of the Department of Correction when they are sued in their individual capacities under the provisions of section 1983. That suggestion evoked from plaintiff a motion for an adjudication that the Attorney General and his staff members may not legally represent individual employees of the Department when sued in cases of this kind. The Court considers that the question involved addresses

itself to the Attorney General, and if he feels that he and his staff can and should represent individual defendants in cases like this, that is the end of the matter. The motion just mentioned will be, and hereby is, denied.

2. The Department of Correction itself is an agency of the State and is not subject to suit under section 1983.

did not ask to have Dr. Smiley called as a witness, and he did not appeal from the decision of the panel to Mr. Lockhart, as he might have done, or to Commissioner Hutto had an appeal to Mr. Lockhart been unavailing.

■ In coming to its conclusion on this particular aspect of the case the Court does not overlook the fact that in addition to seeking to recover damages plaintiff is also seeking to have his forfeited good time restored; and it occurs to the Court that the would-be naming of the members of the Board, Commissioner Hutto, and Superintendent Lockhart may be related to that particular claim for relief rather than to the claim for money damages. However, in the absence of exhaustion of State remedies, and no exhaustion of such remedies is alleged here, the Court has no jurisdiction to restore plaintiff's lost good time in this proceeding even if his conviction by the disciplinary panel was tainted by violations of due process of law. Preiser v. Rodriguez, 1973, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439; McDonnell v. Wolff, 8 Cir., 1973, 483 F.2d 1059, rehearing denied, 1067.

■ Nor does the Court find any substantial factual basis that would justify further prosecution of the case as against Mr. Boren.

From an examination of the record as a whole it appears that petitioner was never formally classified P.M.D. although he was in fact permitted to "lay in" from April to June, except while at the Arkansas Medical Center. His record showed that on June 26 Dr. Smiley had changed his classification from A-2 to A-3 which in itself was a reclassification that was favorable rather than adverse to the plaintiff. More than that, Mr. Boren testified that when he was first called into the controversy when plaintiff refused to go to work on June 27 he talked to Dr. Smiley and was advised that there was no objection to plaintiff being assigned to the garden squad. While Dr. Smiley testified that he does not recall the conversation with

Mr. Boren, he does not deny that it took place.

It is true that plaintiff was kept in punitive isolation for nearly ten days after Dr. Smiley made his entry of July 27 to the effect that petitioner should not work in the garden squad, but there is no evidence that this notation was called to Mr. Boren's attention until August 6, and Mr. Boren says, without any substantial contradiction, that as soon as he learned of the notation, he released plaintiff from isolation and put him to work in the kitchen.

■ As to Dr. Smiley, the original complaint against the doctor was based on the fact that after the doctor examined plaintiff on July 27 he failed to take any steps to correct the "wrong" that had been done plaintiff although he promised to do so; the amendment to the complaint adds the allegation that if plaintiff's true "medical classification been properly brought to attention of the Disciplinary Committee it is assumed that the Disciplinary Court would have rejected the allegations made," and plaintiff blames Dr. Smiley for not having brought plaintiff's allegedly true classification to the attention of the panel.

There is nothing whatever before the Court to indicate that Dr. Smiley was guilty of any intentional wrongdoing with respect to plaintiff. The most that can be said is that the doctor might have kept better medical records on plaintiff than he kept, that perhaps he should have looked at plaintiff's records more closely than he did when Mr. Boren inquired in June as to whether it was appropriate for plaintiff to be assigned to the garden squad, and that perhaps he should have told Mr. Boren or some other person in authority that petitioner should not work in the garden squad after the examination of July 27. In other words, the most that can be said about Dr. Smiley is that he may have been guilty of simple negligence.

The Court is not unmindful of the broad language of the Supreme Court in

Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, as to the scope of section 1983 where a plaintiff brings a civil action for damages against State officers acting under color of law. But, the conduct of the officers involved in that case was quite different in quality from the alleged misconduct of Dr. Smiley of which plaintiff complains; and it should also be observed that the officers involved in *Pape* were law enforcement officers, whereas Dr. Smiley is simply a prison physician hired by the State.

In the very recent case of Brown v. United States et al., 8 Cir., 1973, 486 F. 2d 284, decided on October 29, 1973, which arose in this Court and which was in part an attempt to hold local jailers liable in damages under section 1983 for failure to protect a prisoner from assaults by other prisoners, the Court of Appeals took note of *Pape,* but went on to say, " . . . we are extremely hesitant to hold that mere simple negligence can be the basis of personal liability under § 1983." (Page 287.) And this Court seriously doubts that section 1983 should be construed so broadly as to give a federal forum for an inmate negligence action against a prison doctor who acts "under color of law" only in the sense that he is an employee of the State.

Aside from that, however, it is by no means clear that in plaintiff's particular case assignment to work, at least for a time, in a garden squad was in fact inappropriate.

Dr. Smiley's note of plaintiff's record made on July 27 is to the effect that plaintiff's hip was evidently painful and that the doctor did "not think he can work in the garden squad." The note of July 27 referred to an earlier note of May 10 which was to the effect that plaintiff might be assigned to any duty not requiring excessive standing, walking, stooping, or bending, and that his permanent status should be either P.M. D. or light duty.

Asked about the July 27 notation Dr. Smiley testified before the Magistrate that the notation was more of a prognostic note to himself than anything else and should not necessarily be interpreted as an absolute contra-indication of any garden squad work whatever. And Dr. Smiley observed, somewhat wryly it appears to the Court, " . . . I still have not got to the point that I think when I make these records that they're going to be legal documents. I still think of them as medical and it was mostly a note to myself."

While it may very well be that plaintiff's physical condition was such in June and July, 1973, as to make it inadvisable for him to engage in garden squad work for a long period of time, there is absolutely nothing before the Court to indicate that it would really have hurt him to have done the best he could in the squad until the propriety of that duty assignment could be ascertained definitely.

Plaintiff, however, refused to take that course; he refused to even try to work in the squad, and it was that refusal, rather than anything chargeable to Dr. Smiley or Mr. Boren, that caused him to be confined in violation and to forfeit good time. Further, in connection with the disciplinary proceeding itself plaintiff failed to call witnesses although given an opportunity to do so and failed to ask that his actual medical record be produced for examination. Nor did he undertake to appeal to Mr. Lockhart. More than this, he waited about a month after the disciplinary proceeding to make any effort to get in touch with Dr. Smiley.[3]

---

3. At this point it is well to note that it should not be inferred from anything that has been said that plaintiff was actually in an isolation cell constantly from June 28 to August 6, or that he was on a restricted diet every day during that period. As the Court understands it, the policy of the De- partment generally is that when a man is sentenced to isolation for an indefinite period for refusing to work, he can ordinarily obtain his release upon manifesting a willingness to go to work. As the Court also understands, it is not the policy of the Department to confine an inmate in isolation

Inmates of the Arkansas Department of Correction are properly required to work, and they are not free to choose their own jobs. When an inmate is assigned to duty and directed to report for work, it is his duty to obey that order, and in circumstances other than those that are highly exceptional and which do not seem to be present here, an inmate is not to be permitted to test the propriety of his work assignment by refusing to accept the assignment.

From its consideration of the pleadings and of the information developed by the Magistrate, the Court in the exercise of its discretion does not think that this case should proceed any further against any defendant, and finds that the petition as amended should be dismissed as against all defendants and prospective defendants.

In closing the Court has a word to say about the forfeiture of 365 days of plaintiff's good time. Assuming for a moment, and the Court has some doubt about the validity of the assumption, that it appeared to the disciplinary panel, acting reasonably as things appeared at the time, that such a forfeiture was justified, it seems to the Court that in the light of the facts of the case as they have finally developed the forfeiture of a year of good time may well have been excessive, and that Mr. Hutto and Mr. Lockhart might give some consideration to remitting some if not all of the forfeiture, although the Court is not ordering them to do so.

In view of what has been said, it is ORDERED that leave to proceed further in this cause in forma pauperis as to any defendant or prospective defendant be, and the same hereby is, Denied plaintiff, Bobby Lee Heard, and that his petition herein, as amended, be, and the same hereby is, dismissed without prejudice as to all defendants and prospective defendants.

Plaintiff is now advised that if he desires to appeal from this order to the United States Court of Appeals for the Eighth Circuit, St. Louis, Missouri, he may do so by submitting a written notice of appeal to the Clerk of this Court within 30 days from the date of this Memorandum and Order.

for more than 14 or 15 consecutive days; if he is still recalcitrant at the end of such a period, he is released from isolation and is fed a regular diet for two or three days and then returned to isolation if he is still unwilling to work. With respect to the restrictive diet known as "GRUE," the Court has found the diet to be constitutional, particularly in view of the fact that an inmate in isolation is fed a regular meal every third day.